**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JOSEPH A. BARNES, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>DR. JOSEPH SMITH and DR. JOVITA )<br>ANYANWU, )<br>)<br>Defendants. )<br>)<br>)<br>)<br>) | Case No. 00-CV-06280<br><br>Judge James B. Zagel |

**SECOND AMENDED COMPLAINT**

Plaintiff Joseph A. Barnes ("Mr. Barnes") brings this civil rights and Illinois common law action on behalf of himself against Dr. Joseph Smith and Dr. Jovita Anyanwu, (collectively, the "Defendants") to remedy the violation of Mr. Barnes' civil rights and to recover the damages caused by those Defendants when they (1) refused to test him for more than two years to determine whether he has been exposed to the deadly Hepatitis C virus ("HCV") and (2) refused to evaluate his treatment options and provide appropriate care for his illness.

Over the last several years, HCV has become an epidemic in our nation's prisons and it has infected an increasing number of inmates in the Illinois State prison system. From 1992 and until 2007, Mr. Barnes, an inmate at Hill Correctional Center, has been repeatedly housed with inmates infected with HCV while in other correctional facilities. When Mr. Barnes began suffering from symptoms associated with hepatitis infection, he repeatedly asked the Defendants and other Stateville medical staff to be tested for hepatitis. These requests were

-1-

uniformly refused, and his grievances ignored or denied, until mid-2003, when Mr. Barnes was finally tested for hepatitis. Not surprisingly, Mr. Barnes tested positive for the HCV antibody.

By declining Mr. Barnes' multiple requests for testing and refusing to discuss or provide him with necessary care and treatment, the Defendants placed Mr. Barnes' health in serious jeopardy, demonstrated deliberate indifference to his medical needs, and inflicted great emotional distress upon him.

## JURISDICTION AND VENUE

1. Mr. Barnes brings this action pursuant to 42 U.S.C. § 1983 to remedy violations of his rights under the Eighth Amendment to the United States Constitution as applied to the States under the Fourteenth Amendment. Accordingly, this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Mr. Barnes seeks damages and injunctive relief, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

2. This Court has jurisdiction over Mr. Barnes' state law claim pursuant to 28 U.S.C. § 1367(a) because Mr. Barnes' that claim is related to and arise from the same facts as those upon which Mr. Barnes' § 1983 claim is based. Therefore, these claims together "form part of the same case or controversy" under § 1367(a).

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## PARTIES

4. Mr. Barnes is a citizen of the State of Illinois and, at all times relevant to this matter, was incarcerated at either the Pontiac Correction Center ("Pontiac") or the Stateville Correctional Center ("Stateville"), which is located within this judicial district. Mr. Barnes was incarcerated at Pontiac through the early part of 1998, Stateville through most of 2007, and Hill Correctional Center ("Hill") thereafter.

5. Dr. Joseph Smith formerly served as the Medical Director at Stateville in 1999 and 2000 and was employed by an independent contractor during that time.

6. Dr. Jovita Anyanwu formerly served as the Acting Medical Director at Stateville as early as 2002 and was employed by an independent contractor during that time.

7. At all times relevant herein, Defendants have acted under the color of authority of the law of the State of Illinois or in active concert with such third-parties who are or were so acting.

**EXHAUSTION OF REMEDIES**

8. In or about August 1999, Mr. Barnes became concerned that he had been exposed to HCV and asked to be tested for the virus. Mr. Barnes' request was denied, and on May 28, 2001, Mr. Barnes filed a grievance regarding the denial of his request for a hepatitis test. In his grievance, Mr. Barnes requested a hepatitis test and proper treatment if the test results were positive. At the time of the First Amended Complaint (the "Amended Complaint"), IDOC Rule 504F required that the warden respond with a decision within forty-five days. Mr. Barnes never received a response to this grievance.

9. On or about August 22, 2001, Mr. Barnes wrote letters to Counselors Thompson and Kim Johnson, and to Case Worker Supervisor Mike Krolikiewicz, inquiring about the status of his grievance. Ms. Thompson responded that she likely forwarded the grievance to the medical department, which should have returned it to her with a response. Ms. Johnson responded and noted that she believed the medical department had replied to Mr. Barnes' request for a hepatitis test by stating "we didn't do that."

10. On October 8, 2001, Mr. Barnes filed a grievance regarding the failure of prison officials to respond to his May 28, 2001 grievance. The counselor's response, dated

October 22, 2001, and signed by "S. Waznu," stated that Counselor Thompson now denied having received any grievances from Mr. Barnes related to medical treatment.

11. On October 25, 2001, Mr. Barnes forwarded his original May 28, 2001 grievance to Grievance Officer Georgia Schonauer. The Grievance Officer's Report, reviewed on November 2, 2001, and signed by Grievance Officer Carmen Ruffin, recommended denial of Mr. Barnes' claim as untimely. On November 9, 2001, Warden Kenneth R. Briley concurred and advised Mr. Barnes of the denial.

12. On November 14, 2001, Mr. Barnes appealed the warden's decision to the Director of IDOC and the Administrative Review Board. In a memorandum dated December 20, 2001, the Administrative Review Board denied Mr. Barnes' appeal on the ground that his original grievance was untimely.

13. After fruitless attempts to get IDOC to investigate the lost grievance, on October 1, 2002, Mr. Barnes wrote to Nurse Laigh and Dr. Smith and again requested a hepatitis test and proper treatment if the test results were positive. When he received no response, Mr. Barnes filed another grievance on November 6, 2002, and requested a hepatitis test, and appropriate treatment if he tested positive for HCV.

14. On December 7, 2002, Mr. Barnes received a reply to his November 6, 2002 grievance from Counselor Jerry J. Baldwin. Mr. Baldwin initially received Mr. Barnes' second grievance on November 12, 2002 and forwarded the necessary paperwork to the Stateville Health Care Unit for review. Although Mr. Barnes attached his October 1 request for testing to his grievance, on December 4, 2002, Mr. Baldwin received a written response from the Health Care Unit which "indicated that the inmate received a[n] HIV test on 12/1/00 and that they have not received any documents of a request for a hepatitis test and PPD." Mr. Baldwin

then advised Mr. Barnes to utilize the Health Care Unit's sick call procedures to resolve his problem.

15. On or about January 15, 2003, Mr. Barnes forwarded his November 6, 2002, grievance to Grievance Officer Carmen Ruffin. On January 28, 2003, Grievance Officer Ruffin recommended denial of Mr. Barnes' claim because "This Grievance Officer has no medical expertise or authority to contradict the doctor's recommendation/diagnosis." Furthermore, Grievance Officer Ruffin determined that "No further action required, as it appears that the grievant's medical concerns are being addressed at this time." On February 3, 2003, Warden Briley concurred and advised Mr. Barnes of the denial.

16. On February 4, 2003, Mr. Barnes immediately appealed Warden Briley's decision to the Director of IDOC and the Administrative Review Board. On March 20, 2003, the Administrative Review Board referred Mr. Barnes' grievance back to Stateville "for a review of [his] concerns." Warden Briley received a copy of this letter on April 4, 2003. On information and belief, however, Mr. Barnes has not received a copy of his letter nor has he been contacted about his concerns. In the meantime, Mr. Barnes received his test, but not his treatment.

17. Mr. Barnes has exhausted all administrative remedies available to him. Mr. Barnes has also exhausted all administrative appeals available to this decision.

## THE HCV EPIDEMIC

18. Mr. Barnes has, at all times relevant to this matter, suffered from HCV, a potentially life-threatening disease. Hepatitis is a blood-borne viral infection, which may be transmitted when the blood or body fluids of an infected person enter the body of a person who is not infected. HCV is among the most prevalent strains of the hepatitis virus in the United States.

19. While most commonly transmitted through "high risk" practices, including the sharing of needles among intravenous drug users or unprotected sex with an infected person, HCV may frequently also be transmitted by the sharing of toothbrushes, dental appliances, scissors, razors, or other personal care items that might have blood on them. Continual presence in a correctional facility, whether as a corrections official or as an inmate, is itself considered a "high risk" factor.

20. HCV infection among prison inmates in the United States has reached epidemic proportions. Studies have found rates of infection among incarcerated populations to be ten to twenty times greater than the infection rate found in the general U.S. populace. Various studies have found infection rates of 25% to 42% among inmates, compared to 2% in the total U.S. population.

21. Mere exposure to HCV is highly likely to cause injury. 80% of those exposed to HCV develop chronic HCV infection; 70% of those infected develop chronic liver disease, and 20% develop cirrhosis of the liver. HCV also increases the long-term risk of liver cancer, and may eventually require a liver transplant. In the most serious cases, HCV causes such extensive liver damage that it leads to death. Typical symptoms of HCV infection include jaundice, fatigue, dark urine, abdominal pain, joint pain, loss of appetite, and nausea.

22. While there is no vaccination for HCV infection, medical treatment may be successful in preventing further damage to the liver. Drug treatment has been successful in reducing HCV viral loads to undetectable levels in 30% of cases, and may delay liver damage and the necessity of a liver transplant in other cases.

23. HCV is a serious, communicable disease. The epidemic proportions of HCV in correctional institutions, the typical transmission vectors and symptoms of HCV, and

general medical practice for treatment of HCV infection, including isolation and drug therapy, are common knowledge among the medical community. The Centers for Disease Control and Prevention ("CDC") recommends that "persons at risk for HCV infection who receive health care services in the public and private sectors should have access to counseling and testing." The Federal Bureau of Prisons ("FBOP") recommends testing for inmates who have symptoms of HCV infection, or who have been exposed to a known source of HCV.

24. The National Institute of Health recommends treating HCV with a combination of Pegylated Alpha Interferon and Ribavirin. This treatment regime consists of weekly Interferon injections and Ribavirin pills taken twice daily. In order to successfully control the progression of the disease, however, this treatment must be administered for an uninterrupted period of 48 to 52 weeks. Doctors are also recommending that patients recently diagnosed with HCV receive liver biopsies to determine the progression of their illness and the extent of their liver damage.

### IDOC'S KNOWLEDGE OF AND INDIFFERENCE TO THE HCV CRISIS

25. Pursuant to section 3-8-2(c) of the Illinois Unified Code of Corrections, the legally required standard of care in the correctional setting is the medical examination of all inmates upon admission to a correctional institution, and the isolation of those infected with a communicable disease until isolation is no longer medically necessary.

26. On information and belief, Stateville medical staff, including Defendants, has had particular knowledge of the presence and prevalence of HCV among Stateville inmates. In August 1986, the IDOC contracted with the CDC to conduct a study to measure the prevalence of hepatitis infection among adult males entering the prison system and the likelihood of transmission of hepatitis infection among inmates. This study of hepatitis among inmates

continued until November 1991 or later. Stateville inmates were among the subjects of the study, which was administered in part by Stateville medical staff.

27. Despite this knowledge, inmates at Stateville infected with communicative diseases have not been isolated from other prisoners. Moreover, inmates have routinely been locked in their cells for extended periods, without access to showers, and often reduced to washing themselves using toilet water without the benefit of disinfectant. On information and belief, Stateville medical staff, including Defendants, have known that inmates assigned to cut hair have done so with a single set of hair clippers, proceeding from inmate to inmate without using any form of disinfectant on the clippers between haircuts. Personal care items, including toothbrushes, dental appliances, or razors, have routinely been used by other inmates without permission from the owner-inmate.

28. At the time of his incarceration in the Illinois prison system in 1982, and for a period of time thereafter, Mr. Barnes was free from hepatitis infection. Aside from his status as an incarcerated person who has been exposed to HCV in his daily routines, Mr. Barnes has not engaged in practices that would place him commonly considered at "high risk" for exposure to or transmission of HCV.

29. From March 1992, until each was transferred to Stateville in 1998, Mr. Barnes and James Gaston, another inmate, were housed together at Pontiac. Mr. Barnes and Mr. Gaston were closely associated at Pontiac, at times sharing meals from the same bowls, drinking from the same cups, or eating with the same utensils. Mr. Barnes and Mr. Gaston also shared other personal items, including nail clippers, beard trimmers, and hair clippers.

30. In July 2000, Mr. Gaston learned that he had been infected with HCV. Mr. Gaston spoke with Dr. Joseph Smith, who was Stateville's Medical Director at the time, and requested treatment. Dr. Smith denied medical treatment to Mr. Gaston at that time.

31. In July and August 1999, Mr. Barnes was housed with another inmate, Johnny Walls, for a period of about six weeks. During this entire period, Mr. Walls was continually ill and exhibited symptoms consistent with HCV infection. Mr. Walls frequently vomited in the cell's toilet or a trash bag. On at least one occasion, Mr. Barnes was splattered in the eye by Mr. Walls' vomit. In August 1999, Mr. Walls was transferred to the University of Chicago hospital for medical treatment.

32. In August 1999, after Mr. Walls' transfer, inmate Alexander Traylor was placed in Mr. Barnes' cell. Mr. Traylor was housed with Mr. Barnes even though the Stateville medical staff and other prison officials were aware that he was infected with HCV. After several months, Mr. Traylor advised Mr. Barnes that he was infected with HCV. During his confinement with Mr. Barnes, Mr. Traylor received no medical treatment for his HCV infection. Mr. Traylor eventually left Mr. Barnes' cell when he became too ill to function in the general prison population. Among other maladies, Mr. Traylor suffered from jaundice and problems digesting food. Mr. Traylor was transferred to the Stateville Health Care Unit and then later to the University of Chicago hospital for treatment.

33. After being housed with Mr. Traylor, Mr. Barnes began to suffer from ailments symptomatic of HCV infection. He suffered "flu-like" symptoms, including fatigue, headaches, loss of appetite, loss of weight, nausea and vomiting, fever, weakness and abdominal pain.

34. Mr. Barnes repeatedly complained to Stateville medical staff about his symptoms and his concern that he might be infected with HCV, but his requests for testing and treatment were refused or ignored.

35. On September 13, 1999, Mr. Barnes was examined by Stateville medical staff. He tested negative for HIV, but positive for tuberculosis. Despite his request, a hepatitis test was not administered.

36. On January 11, 2000, Mr. Barnes spoke with a medical technician on the Stateville medical staff, and his request for a hepatitis test was again denied. Three days later, on January 14, 2000, Mr. Barnes wrote a letter to Dr. Joseph Smith in which he again requested that he be tested for HCV infection. Mr. Barnes never received a response to his request.

37. On or about March 2, 2000, Mr. Barnes again wrote to Dr. Smith. In his letter, he advised Dr. Smith that the Stateville medical staff had failed to adequately examine and treat his problems, which included joint pain, and requested that he receive treatment or "a proper examination." Mr. Barnes received no response to his request.

38. In a letter to Ms. Laigh, dated July 18, 2000, Mr. Barnes again requested that he be tested for HCV. Again, Mr. Barnes received no response to his request.

39. On November 8, 2000, Mr. Barnes met with Stateville Nurse Jenny Laigh, who informed him he would not be tested for hepatitis.

40. On April 27, 2001, Mr. Barnes suffered from headaches and aching bones, which are symptoms of HCV. He requested a medical test from Med-Tech Amrutlal M. Patel, who only suggested that he sign money vouchers for cold medication. On May 2, 2001, Mr. Barnes again attempted to speak with Mr. Patel regarding his symptoms, yet was similarly rebuffed.

41. On May 21, 2001, Mr. Barnes continued to suffer from headaches and aching bones. This time, Mr. Barnes requested a hepatitis test from Med-Tech Mike Borkrowski. However, Mr. Barnes was told that "they don't do that test here" and asked to sign a money voucher for cold medication.

42. After repeated requests to various Med-Techs, the Stateville medical staff finally examined Mr. Barnes between September 14 and 16, 2001. This was the first time Mr. Barnes had been examined since his initial visit to the Health Care Unit more than two years earlier. Despite Mr. Barnes' visible symptoms, the Stateville medical staff still continued to refuse to administer a hepatitis test.

43. On February 18, 2002, and May 13, 2002, Mr. Barnes suffered from headaches and a rash on his chest and shoulders. On both occasions, Mr. Barnes requested a hepatitis test from Med-Tech David Barnes, who failed to provide Mr. Barnes with any medical assistance.

44. During the week of May 20, 2002, Mr. Barnes spoke with another Med-Tech and requested a hepatitis test. The Med-Tech responded by putting Mr. Barnes on the list to see a member of Stateville's medical staff.

45. On information and belief, Mr. Barnes went to see Dr. Anyanwu on May 23, 2002 to request a hepatitis test. Mr. Barnes also requested treatment for his aching bones and joints as well as the rash on his chest and shoulders. Although these are symptoms commonly associated with hepatitis infection, Dr. Anyanwu still refused to give Mr. Barnes a hepatitis test.

46. Mr. Barnes continued to suffer from aching bones and joints. On information and belief, Mr. Barnes went to see Dr. Anyanwu on August 22, 2002. Mr. Barnes

again requested a hepatitis test. He was again told that Stateville did not administer hepatitis tests.

47. On or around September 23, 2002, Mr. Barnes met with Med-Tech Patel for the third time and requested that Mr. Patel administer a hepatitis test. Mr. Patel refused.

48. On February 25, 2003, after several months of inaction and Warden Briley's refusal to grant Mr. Barnes' requested relief, Mr. Barnes' counsel contacted Rachel McKenzie, the Illinois Department of Corrections Assistant Deputy Chief Legal Counsel.

49. Mr. Barnes was subsequently taken to meet with Stateville Medical Director Kevin Smith. Dr. Smith inquired into Mr. Barnes' health concerns and also reviewed his medical records. Despite Mr. Barnes' detailed explanation of his symptoms, however, Dr. Smith still refused to provide Mr. Barnes with a hepatitis test. Instead, Dr. Smith decided only to administer a chest X-Ray and take Mr. Barnes' blood pressure before sending him back to his cell.

50. On or around March 17, 2003, after a second conversation between Mr. Barnes' counsel and Ms. McKenzie and almost two years after his initial request, Mr. Barnes was finally given a hepatitis test. Four days later, Mr. Barnes' test results came back positive for the HCV antibody.

51. Throughout this entire period described in paragraphs 1-50, Mr. Barnes suffered great emotional distress from his belief, and later reality, that he had been exposed to HCV.

52. Throughout this same period described above, Mr. Barnes was repeatedly examined by psychiatrists in an effort to cope with his depression, which was partially onset by Mr. Barnes' belief that he had HCV and was not being treated for it.

## COUNT I

### SECTION 1983 CLAIM FOR DELIBERATE INDIFFERENCE TO MEDICAL NEEDS

53. Mr. Barnes incorporates by reference paragraphs 1-52, as though fully set forth in this Count I.

54. On information and belief, the Defendants had knowledge of (1) Mr. Barnes' continuous exposure to HCV, a serious, communicable disease; (2) his manifestation of symptoms characteristic of one infected with HCV; (3) his repeated requests for medical testing and treatment; and (4) the denial of those requests. The Defendants also knew that Illinois law required the segregation of inmates with infectious disease from healthy inmates. Despite this knowledge, the Defendants, either directly or through medical and other prison staff acting at their direction, disregarded Mr. Barnes' request for testing and treatment, and failed to implement a program for testing inmates who may have been exposed to HCV.

55. HCV infection is a severe illness. Proper diagnosis and treatment are essential to ensure the preservation of the patient's life and health. Upon a showing of exposure and manifestation of obvious symptoms, medical testing for HCV infection is a necessary precursor to proper medical treatment, and the failure to treat this illness is likely to result in serious injury.

56. At all relevant times, the Defendants were acting under color of law when they repeatedly refused Mr. Barnes' reasonable and appropriate requests for a hepatitis test. The Defendants' inexcusable delay in administering a medically necessary test for HCV infection was reckless, callous, grossly negligent, and exhibited deliberate indifference to Mr. Barnes' health in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

57.     As a direct and proximate result of the action or inaction of the Defendants and those acting at their direction, Mr. Barnes has suffered for nearly ten years with ailments symptomatic of HCV infection without treatment, causing emotional and mental anguish, fear of worsened health and well-being, and exacerbation of any liver damage caused by HCV infection itself.  Thus, the Defendants are liable to Mr. Barnes for damages.

58.     The actions and inactions of the Defendants, as set forth in this Court I, were undertaken maliciously, intentionally, or with gross and reckless disregard for Mr. Barnes' rights, thereby justifying an award of punitive damages in a fair and reasonable amount.

## COUNT II
### ILLINOIS STATE LAW CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

59.     Mr. Barnes incorporates by reference paragraphs 1-52, as though fully set forth in this Count II.

60.     On information and belief, the Defendants had knowledge of (1) Mr. Barnes' continuous exposure to HCV, a serious, communicable disease; (2) his manifestation of symptoms characteristic of one infected with HCV; (3) his repeated requests for medical testing and treatment; and (4) the denial of those requests.  The Defendants also knew that Illinois law required the segregation of inmates with infectious disease from healthy inmates.  Despite this knowledge, the Defendants, either directly or through medical and other prison staff acting at their direction, repeatedly housed Mr. Barnes with inmates who exhibited symptoms of HCV, disregarded Mr. Barnes' requests for testing and treatment, and failed to implement a program for testing inmates who may have been exposed to HCV.

61. The Defendants owed Mr. Barnes a duty to exercise reasonable medical care for Mr. Barnes as he was an inmate entrusted to their care by the State of Illinois.

62. The Defendants breached their duty of care by repeatedly failing to test and treat Mr. Barnes for HCV, even though Mr. Barnes' symptoms and environment indicated that Mr. Barnes could have been infected with HCV.

63. As a direct result of the Defendants' repeated failure to test Mr. Barnes and investigate his health issues in a responsible manner, Mr. Barnes suffered great emotional distress.

64. Mr. Barnes was directly impacted by the Defendants' failure to test him for HCV. Specifically, Mr. Barnes lived in a constant state of dehabilitating emotional distress in the forms of worry and fear that he was infected with a deadly disease and that nobody was going to help him battle the disease. Thus, the Defendants are liable to Mr. Barnes for damages.

65. The Defendants are not eligible for qualified sovereign immunity because they were not employed by the State of Illinois during the complained of time period. Rather, the Defendants were employed by a private firm that contracted with the IDOC for profit and in competition with other firms. Defendants did not act under close official supervision by the IDOC.

66. There is no firmly rooted tradition of immunity for employees of an independent contractor providing medical services for a State prison.

67. The threat of competition from other organized, private, medical firms will prevent unwarranted timidity from doctors like the Defendants, and readily available insurance and private compensation packages ensure that talented doctors will not be deterred from providing medical services to state prisons even if they are not eligible for sovereign immunity.

-16-

68.     n information and belief, during the relevant time period there were numerous private medical firms such as the ones that employed the Defendants and which served prisons throughout the country.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Joseph A. Barnes prays that judgment be entered against the Defendants and that this Court direct the Defendants to: (1) pay Mr. Barnes actual damages and punitive damages; (2) pay costs of this action, including reasonable attorneys' fees incurred herein; and (3) for such other and further relief as this Court deems equitable and just.

        Respectfully submitted,

        JOSEPH A. BARNES


        By: /s/ Edward F. Malone_____
            One of his attorneys

Edward F. Malone
Sandi J. Toll
David P. Saunders
JENNER & BLOCK, LLP
330 North Wabash Avenue
Chicago, Illinois 60611-7603
(312) 222-9350

## **CERTIFICATE OF SERVICE**

       This is to certify that on February 11 2008, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause the foregoing document to be served upon the following counsel of record:

| | |
|---|---|
| Mr. Robert P. Vogt<br>Weldon-Linne & Vogt<br>105 West Madison Street<br>Suite 1400<br>Chicago, Illinois 60602<br>bvogt@wlv-online.com | Mr. David H. Schroeder<br>Charysh & Schroeder, Ltd.<br>33 North Dearborn Street<br>Suite 1300<br>Chicago, Illinois 60602<br>dschroeder@cslaw-chicago.com |

                              By:    /s/ David P. Saunders
                                          David P. Saunders